WINDHAM TAXPAYERS ASSOCIATION ET AL. *v.* BOARD
OF SELECTMEN OF THE TOWN OF WINDHAM ET AL.
(15242)

BORDEN, BERDON, NORCOTT, KATZ and SPEAR, Js.

Argued May 26—decision released August 1, 1995

*Richard S. Cody*, with whom, on the brief, was *Joseph B. Mathieu*, for the appellants-appellees (defendants).

*Lori Welch-Rubin*, for the appellees-appellants (plaintiffs).

*Mary-Michelle U. Hirschoff* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

KATZ, J. The dispositive issue in this appeal and cross appeal is whether the defendant board of selectmen (board)[1] was required to submit a proper petition by the plaintiff Windham Taxpayers Association (association),[2] pursuant to a special town meeting, to a spe-

---

[1] The named defendant is the board of selectmen of the town of Windham. In addition, the other defendants are Walter Pawelkiewicz, George E. Barton, Hanna K. Clements, Joseph S. Marsalisi, John J. McGrath, Jr., Yolanda Negron, Charlotte S. Patros, Lawrence Schiller, Sam Shifrin, Sebastian Ternullo, Thomas W. White, Windham Middle School Building Committee, Susan Collins, Rebecca Grillo, Paulann Lescoe, Barbara McGrath, Angela Mesick, Juan Montalvo, George Patros and Lynne Weeks.

[2] The plaintiffs are the association, William Rood and Steven Edelman. The association is a nonprofit organization comprised of a group of individuals who are qualified to vote and who are taxpayers in Windham. The

cial referendum for the purpose of reconsidering an appropriation of money to construct a school. In order to consider that issue, we must address the underlying issue of whether General Statutes § 7-1,[3] which requires that a town meeting be held upon petition of twenty or more qualified voters, preempts a town's charter, enacted pursuant to the Home Rule Act,[4] that vests legislative authority in a board of selectmen and delineates the limited situations requiring a town meeting. We conclude that because the procedures for reconsideration of a prior legislative act are of local concern, the charter controls the resolution of this issue and that, therefore, the board was empowered to decide whether to reconsider the appropriation.

The trial court, *Foley, J.*, found the following relevant facts. In 1990, discussions began for the construction of a new middle school in Windham. On March 1, 1994, a town meeting was held to consider the appropriation of $24,500,000 for the design and construction of a new middle school to be located on Quarry Street

association organized both rescission referendum petitions. The individual plaintiffs, Rood and Edelman, are qualified voters and taxpayers in Windham. They both reside in Windham and are members of the association.

[3] General Statutes § 7-1 provides: "(a) Except as otherwise provided by law, there shall be held in each town, annually, a town meeting for the transaction of business proper to come before such meeting, which meeting shall be designated as the annual town meeting. Special town meetings may be convened when the selectmen deem it necessary, and they shall warn a special town meeting on application of twenty inhabitants qualified to vote in town meetings, such meeting to be held within twenty-one days after receiving such application. Any town meeting may be adjourned from time to time as the interest of the town requires.

"(b) Where any town's public buildings do not contain adequate space for holding annual or special town meetings, any such town may hold any such meeting outside the boundaries of the town, provided such meetings are held at the nearest practical locations to the town."

[4] The Home Rule Act is codified at General Statutes §§ 7-187 through 7-201.

in the Willimantic section of Windham.[5] The town decided to send this issue to a referendum vote, which, if passed, would also authorize the issuance of bonds and other obligations to help finance the construction of the school. On March 15, 1994, Windham passed this referendum by a four vote majority. Following the passage of the referendum, Windham entered into a contract with the architectural firm of Russell Gibson von Dohlen, Inc., to design and construct the school.

On March 28, 1994, 702 individuals qualified to vote in Windham presented a petition to the board pursuant to General Statutes §§ 7-1,[6] 7-2,[7] and 7-7,[8] requesting

[5] On November 17, 1993, the Windham board of finance had approved the appropriation of $20,000 to pay for prereferendum architectural services.

A notice of this town meeting had stated that one of its purposes was "[t]o consider a resolution, (a) to appropriate $24,500,000 for design and construction of an approximately 1,100 student capacity middle school serving grades five through eight to be located on Town-owned land known as 123 Quarry Street in the Willimantic section of the Town, including drives, parking areas, sidewalks, athletic fields, utilities and other related improvements. The appropriation may be spent for design and construction costs, equipment, furnishings, materials, architects' fees, engineering fees, construction management fees, study, test and permits costs, legal fees, net temporary interest and other financing costs, and other expenses related to the project;

"(b) to authorize the issue of bonds or notes of the Town in an amount not to exceed $24,500,000; to determine, or authorize the First Selectman and the Treasurer to determine, the amount, date, interest rates, maturities, form and other particulars of the bonds or notes . . . ."

[6] See footnote 3 for the text of § 7-1.

[7] General Statutes § 7-2 provides: "Notwithstanding the provisions of section 7-1, any town may adopt an ordinance, in the manner provided by section 7-157, requiring that a special town meeting be warned by the selectmen on application of at least fifty inhabitants qualified to vote at town meetings, such meeting to be held within twenty-one days after such application is received by the selectmen; provided nothing in this section shall be construed to affect any ordinance legally adopted prior to October 1, 1957."

[8] General Statutes § 7-7 provides: "All towns, when lawfully assembled for any purpose other than the election of town officers, and all societies and other municipal corporations when lawfully assembled, shall choose a moderator to preside at such meetings, unless otherwise provided by law; and, except as otherwise provided by law, all questions arising in such meet-

that the board call a special town meeting for the purpose of setting the time and place of a special referendum to rescind the action on the ballot question of March 15, 1994.[9] The board rejected the March 28 petition and did not call a town meeting.

ings shall be decided in accordance with standard parliamentary practice, and towns, societies and municipal corporations may, by ordinance, adopt rules of order for the conduct of their meetings. At any such town meeting the moderator shall be chosen from the last-completed registry list of such town. Two hundred or more persons or ten per cent of the total number qualified to vote in the meeting of a town or other municipal corporation, whichever is less, may petition the clerk or secretary of such town or municipal corporation, in writing, at least twenty-four hours prior to any such meeting, requesting that any item or items on the call of such meeting be submitted to the persons qualified to vote in such meeting not less than seven nor more than fourteen days thereafter, on a day to be set by the town meeting or, if the town meeting does not set a date, by the town selectmen, for a vote by paper ballots or by a 'Yes' or 'No' vote on the voting machines, during the hours between twelve o'clock noon and eight o'clock p.m.; but any municipality may, any provision of any special act to the contrary notwithstanding, by vote of its legislative body provide for an earlier hour for opening the polls but not earlier than six o'clock a.m. The selectmen of the town may, not less than five days prior to the day of any such meeting, on their own initiative, remove any item on the call of such meeting for submission to the voters in the manner provided by this section or may submit any item which, in the absence of such a vote, could properly come before such a meeting to the voters at a date set for such vote or along with any other vote the date of which has been previously set. The paper ballots or voting machine ballot labels, as the case may be, shall be provided by such clerk or secretary. When such a petition has been filed with such clerk or secretary, the moderator of such meeting, after completion of other business and after reasonable discussion, shall adjourn such meeting and order such vote on such item or items in accordance with the petition; and any item so voted may be rescinded in the same manner. If such moderator resigns or is for any other cause unable to serve as moderator at such adjourned meeting, such clerk or secretary shall serve, or may appoint an elector of such municipality to serve, as moderator of such adjourned meeting. Such clerk or secretary, as the case may be, shall phrase such item or items in a form suitable for printing on such paper ballots or ballot labels, provided that the designation of any such item shall be in the form of a question, as prescribed under section 9-369. The vote on any item on the call of a town or other municipal corporation shall be taken by paper ballot if so voted at the meeting, if no petition has been filed under this section with reference to such item."

[9] The ballot question of March 15, 1994, provided: "Shall the Town of Windham appropriate $24,500,000.00 for the design and construction of a mid-

Subsequently, on April 29, 1994, thirty-eight individuals qualified to vote in Windham presented a petition to the board requesting it to call a special town meeting to reconsider the March 28 petition for the purpose of rescinding the action on the ballot question of March 15. The board also rejected this petition.

After the board's decision to reject the March 28 referendum petition, the plaintiffs brought this action against the defendants seeking: "(1) a writ of mandamus ordering that the defendant-selectmen, forthwith set the time and place of a special referendum to rescind the action on the ballot question: 'Shall the Town of Windham appropriate $24,500,000.00 for the design and construction of a middle school to be located on Town-owned land on Quarry Street in Willimantic and authorize the issue of bonds and notes in the same amount to defray said appropriation?' of March 15, 1994; alternatively (2) a writ of mandamus ordering that the defendant-selectmen, forthwith call a special town meeting to reconsider the petition submitted to rescind the action on the ballot question: 'Shall the Town of Windham appropriate $24,500,000.00 for the design and construction of a middle school to be located on Town-owned land on Quarry Street in Willimantic and authorize the issue of bonds and notes in the same amount to defray said appropriation?' of March 15, 1994, and to reconsider and vote on said petition by the legislative body. The plaintiffs further claim (3) an injunction to stop the construction and continued expenditure of funds for the proposed Windham Middle School . . . ."[10] The trial court determined that the plaintiffs were not entitled to either mandamus or injunctive relief.

---

dle school to be located on Town-owned land on Quarry Street in Willimantic and authorize the issue of bonds and notes in the same amount to defray said appropriation?"

[10] A fourth claim for declaratory relief was withdrawn.

The trial court first determined that the plaintiffs had both voter and taxpayer standing to bring the action against the defendants. Rood and Edelman had voter standing because they were aggrieved by the board's failure to hold the requested town meeting at which they would have had the right to vote. The trial court also found that, because Rood and Edelman had suffered an injury in the form of increased taxes to pay for the new school, they had taxpayer standing. Furthermore, the trial court found that the association had standing "in its representative capacity as a nonprofit corporation comprised solely of residents and taxpayers of the Town of Windham, whose organizational purpose is to promote fiscal conservatism and the power of initiative. Having organized the two petition campaigns at issue herein, and having many members [who] signed the petitions, the plaintiff Windham Taxpayers Association had a legally cognizable interest that the referendum or special town meeting be held."[11]

On the merits, the trial court focused on the defendants' contention that the board was not required to submit the March 28 petition to a town meeting because such a petition did not fall within one of the four enumerated categories in Section XI-3 of the town charter, which delineates the circumstances requiring a

[11] The trial court also concluded that the association had standing under a three part test: "(1) its members would 'otherwise have standing to sue in their own right'; (2) the interests the association seeks to protect are 'germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' "

Moreover, the trial court determined that the matter was justiciable, disagreeing with the defendants' argument that the matter was incapable of being adjudicated because it is a political question. The trial court determined that this issue did not present a political question because its adjudication would not place the court in conflict with a coequal branch of government.

town meeting.[12] The trial court disagreed with the defendants' position, concluding that these provisions of the charter were preempted by §§ 7-1, 7-2, 7-6 and 7-7 because, in the court's view, there was a conflict between the charter and the statutes. The court reasoned that state law protects the power of initiative, which cannot be destroyed by a conflicting town charter. See General Statutes §§ 7-1, 7-2, 7-6 and 7-7. The trial court stated: "Because the defendants' *interpretation* of the Town Charter, as read in conjunction with the Home Rule Act, removes that right of initiative by petition in virtually all situations except four, a right created by state statute, that the state has expressly bestowed on the people, and the state and federal constitutions guarantee, such interpretation cannot legally stand. By definition, the defendants' contention that, 'unless the subject matter of the petition falls within the mandatory subjects of Article XI-3 of the Windham Charter, it is up to the selectmen's [unbridled] discretion whether to warn a Special Town meeting' irreconcilably conflicts with General Statutes §§ 7-1, 7-2, 7-6 and 7-7, thus exceeding the powers allotted to a municipality. . . . General Statutes §§ 7-1 and 7-7 mandate that a special town meeting and referendum respectively shall be held upon a proper petition. The Charter of the Town of Windham is not in conflict with the statutes; the interpretation of the Charter presently

---

[12] Section XI-3 of the Windham town charter provides: "Town meeting approval shall be required for the following: (a) consideration of the annual budget; (b) approval of any additional appropriation in excess of $20,000 for any purpose; (c) authorizing the issuance of bonds or notes or other borrowing; (d) any sale or purchase of real estate of the Town used or reserved for Town or Service District purposes. The Board of Selectmen may submit any other matter it desires to town meeting for its consideration. The town meeting shall not act upon any appropriation in excess of $20,000 except upon the recommendation of the Board of Finance, nor shall it increase the amount of any appropriation above the amount recommended by the Board of Finance."

being advanced by the defendants, is in conflict with the state statutes.'' (Citations omitted; emphasis in original.)

In considering whether to issue a writ of mandamus, the trial court examined whether the plaintiffs' petitions to the board were proper. It concluded that they were not for a proper purpose because there was no provision in either petition for the protection of the architects who had contracted with Windham to construct the new school. Thus, the court concluded: ''Accordingly, based upon the facts of this case where a referendum has occurred allowing for the expenditure of public funds, and where an attempt is made to subsequently rescind the prior vote, this court holds that it is proper for the selectmen to reject a proposed initiative that fails to protect persons who have acted upon the faith of the [prior] vote and fails to provide for payment of legal obligations of the [municipality] arising from contracts already made and entered into by the [municipality] prior to such rescission.'' (Internal quotation marks omitted.) Accordingly, the trial court denied the plaintiffs' request for writs of mandamus.[13]

Thereafter, the defendants appealed and the plaintiffs cross appealed to the Appellate Court. We transferred the appeal and the cross appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

On appeal, the defendants, although agreeing with the trial court's denial of the plaintiffs' claims for relief, claim that the trial court incorrectly decided that: (1)

---

[13] Concluding that mandamus is available as an appropriate remedy at law if a proper petition is submitted to the board and is denied, the trial court denied the plaintiffs' request for an injunction because they had failed to prove the lack of an adequate remedy at law. *Clark* v. *Gibbs*, 184 Conn. 410, 419, 439 A.2d 1060 (1981).

General Statutes §§ 7-1, 7-2 and 7-7 required the board to hold a town meeting upon the petition of twenty or more qualified voters, notwithstanding contrary provisions in Windham's town charter; (2) the plaintiffs had standing to maintain an action for mandamus and injunctive relief; (3) the plaintiffs' action presented a justiciable controversy; and (4) the court could rely on the testimony of former town selectmen in determining whether the board was required to hold a town meeting. On their cross appeal, the plaintiffs claim that the petitions were presented for a proper purpose because the architects' interests were adequately protected by contract law and, consequently,the trial court improperly denied their request to compel the board to hold a referendum.

## I

Before reaching the merits of the case, we must address the jurisdictional issues presented by this appeal. "A possible absence of subject matter jurisdiction must.be addressed and decided whenever the issue is raised." *Sadloski* v. *Manchester*, 228 Conn. 79, 84, 634 A.2d 888 (1993).

## A

We first determine whether this court has jurisdiction to hear the defendants' appeal from the trial court. "It is settled law that the right to appeal is purely statutory and is allowed only if the conditions fixed by statute are met. *Zachs* v. *Public Utilities Commission*, 171 Conn. 387, 394, 370 A.2d 984 [1976]; *Prevedini* v. *Mobil Oil Corporation*, 164 Conn. 287, 293, 320 A.2d 797 [1973]. *In re Juvenile Appeal (Anonymous)*, 181 Conn. 292, 293, 435 A.2d 345 (1980). *Local 1303 & Local 1378* v. *FOIC*, 191 Conn. 173, 175, 463 A.2d 613 (1983). . . . In all civil actions a requisite element of appealability is that the party claiming error be aggrieved by the decision of the trial court. . . .

"The test for determining aggrievement encompasses a well settled twofold determination: first, the party claiming aggrievement must demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest shared by the community as a whole; second, the party claiming aggrievement must establish that this specific personal and legal interest has been specially and injuriously affected by the decision. *Zoning Board of Appeals* v. *Freedom of Information Commission*, 198 Conn. 498, 502, 503 A.2d 1161 (1986) [superseded on other grounds by *Hartford* v. *Freedom of Information Commission*, 201 Conn. 421, 518 A.2d 49 (1986)]; *Cannavo Enterprises, Inc.* v. *Burns*, 194 Conn. 43, 47, 478 A.2d 601 (1984); *Local 1303 & Local 1378* v. *FOIC*, supra, [191 Conn.] 176; *Mystic Marinelife Aquarium, Inc.* v. *Gill*, 175 Conn. 483, 493, 400 A.2d 726 (1978). Mere status as a party or a participant in the proceedings below does not in and of itself constitute aggrievement for the purposes of appellate review. *Hartford Distributors, Inc.* v. *Liquor Control Commission*, 177 Conn. 616, 620, 419 A.2d 346 (1979)." (Internal quotation marks omitted.) *Milford* v. *Local 1566*, 200 Conn. 91, 95–96, 510 A.2d 177 (1986); see Practice Book § 4000.[14]

Because the defendants prevailed at trial, and they have not otherwise indicated how their interests were affected by the decision,[15] they were not aggrieved by

---

[14] Practice Book § 4000 provides: "If a party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, that party may appeal from the final judgment of the court or of such judge, or from a decision setting aside a verdict, except in small claims cases, which shall not be appealable, and appeals as provided in Gen. Stat. §§ 8-8, 8-9, 8-28 and 8-30."

[15] We recognize that, following the trial court's decision, the plaintiffs submitted to the board a third petition incorporating the trial court's suggestions for the contents of a proper petition. To the extent that the defend-

the trial court's decision. See *Equitable Life Assurance Society of the United States* v. *Slade*, 122 Conn. 451, 464–65, 190 A. 616 (1937); C. Tait, Connecticut Appellate Practice and Procedure (2d Ed. 1993) §§ 2.28, 3.4 (b); see also *Water Pollution Control Authority* v. *Keeney*, 234 Conn. 488, 494–96, 662 A.2d 124 (1995). Therefore, the defendants do not have standing and we do not have jurisdiction to consider the issues directly raised in their appeal. See *In re Application of Pagano*, 207 Conn. 336, 340, 541 A.2d 104 (1988). Accordingly, the defendants' appeal is dismissed. If we have jurisdiction over the plaintiffs' cross appeal, however, we can consider the defendants' claims as alternate grounds for affirmance.[16]

Because the plaintiffs were denied their requested relief and were therefore "injured" by the trial court's decision, the plaintiffs were aggrieved by the decision of the trial court if the injury was to a "specific, personal and legal interest in the subject matter" of the trial court's decision. Thus, if the plaintiffs possessed such an interest, they have standing to bring their cross appeal in this court, and we have jurisdiction to determine the issues raised in that cross appeal. See Practice Book § 4005.[17]

ants suggest that they are aggrieved due to the collateral effects that the trial court's decision would have on litigation related to the plaintiffs' subsequent petition to the board, we note that, as in *Water Pollution Control Authority* v. *Keeney*, 234 Conn. 488, 494–96, 662 A.2d 124 (1995), the defendants have failed to show how the trial court's decision would have any collateral effect on a subsequent proceeding.

[16] Although pursuant to Practice Book § 4013, a party must give notice of alternate grounds for affirmance, under the circumstances of this case, the defendants' appeal gave adequate notice to the plaintiffs, who responded substantively thereto.

[17] Practice Book § 4005 provides: "Any appellee or appellees aggrieved by the judgment or decision from which the appellant has appealed may jointly or severally file a cross appeal within ten days from the filing of the appeal. Except where otherwise provided, the filing and form of cross appeals, extensions of time for filing them, and all subsequent proceedings

B

We next determine whether the plaintiffs possessed such an interest, in the context of considering whether they originally had standing to bring suit against the board.[18] "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Citations omitted; internal quotation marks omitted.) *Sadloski* v. *Manchester*, supra, 228 Conn. 84; *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 693, 600 A.2d 1019 (1991).

To establish standing, the party bringing suit must allege aggrievement caused by the actions of an entity of the municipality. *Double I Ltd. Partnership* v. *Glastonbury*, 14 Conn. App. 77, 79–80, 540 A.2d 81,

---

shall be the same as though the cross appeal were an original appeal. No entry or record fee need be paid, but security to the appellant for costs shall be given as upon an original appeal."

[18] We recognize that the issue of whether the plaintiffs had standing to bring suit in the Superior Court was raised in this court by the defendants in their appeal and that we have already concluded that the defendants do not have standing to appeal the judgment of the trial court. Because the issue of standing implicates the court's subject matter jurisdiction, however, we review the trial court's determination that the plaintiffs had demonstrated an injury to their legal interest in the controversy sufficient to establish standing to bring suit.

cert. denied, 208 Conn. 802, 545 A.2d 1100 (1988). As we stated above, "[f]irst, the party claiming aggrievement must demonstrate a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must establish that this specific, personal and legal interest has been specially and injuriously affected by the decision." *Hall* v. *Planning Commission*, 181 Conn. 442, 444, 435 A.2d 975 (1980); *Double I Ltd. Partnership* v. *Glastonbury*, supra, 80.

We agree with the trial court that both Rood and Edelman satisfied the requirements of voter standing because, as registered voters in Windham, they were qualified to vote at both the proposed petition referendum and the proposed special town meeting. This right to vote was their legal interest in the present controversy. They were deprived of the opportunity to vote by the board. Therefore, they were aggrieved because if the board had been required to grant either petition and had called a special town meeting, Rood and Edelman would have been able to exercise their right to vote. *Quoka* v. *Drapko,* Superior Court, judicial district of Ansonia-Milford, Docket No. 0036714S (November 25, 1992) (taxpayer had standing to bring mandamus action because he was qualified to vote under provisions of General Statutes § 7-6 at special town meeting); see *Clark* v. *Gibbs*, 184 Conn. 410, 439 A.2d 1060 (1981).

Furthermore, the association satisfied the requirements of standing in its representative capacity because it meets the three conditions of standing for associations: (1) its members would otherwise have standing to sue in their own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit. See *Hunt* v. *Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977); *Timber Trails Corp.* v. *Planning & Zoning Commission*, 222 Conn. 380, 393, 610 A.2d 620 (1992). First, the association's members would have otherwise had standing to sue in their own right. Here, we have determined that the individual plaintiffs had standing to sue. Second, the interests that the association seeks to protect were germane to its purpose. The purpose of the association is to promote fiscal conservatism and the power of initiative. The interest that it sought to protect was the town citizens' right to vote. Third, neither the claim asserted nor the relief requested required the participation of individual members in the lawsuit. Writs of mandamus to compel a referendum can be pursued without the participation of individuals. Therefore, the plaintiffs had voter standing to bring this action in the Superior Court.[19]

Having concluded that the plaintiffs had a "specific, personal and legal interest in the subject matter of the decision," we further conclude that that interest was injured by the trial court's denial of their requested relief. Consequently, the plaintiffs were aggrieved by the decision of the trial court and have standing to appeal that court's decision to this court. As a result, we have jurisdiction to hear the plaintiffs' cross appeal.

## II

We next consider the plaintiffs' claim on cross appeal: that the trial court improperly denied their requests for writs of mandamus and injunctive relief on the basis that they had failed to present the petitions for a

---

[19] Because we hold that the plaintiffs had voter standing, we do not reach the issue of whether they had taxpayer standing.

"proper purpose."[20] Because the validity of the trial court's conclusion on this issue necessarily depends on the claim asserted by the defendants, namely that the trial court improperly concluded that §§ 7-1, 7-2 and 7-7 preempt the town's charter to the extent that the charter may be interpreted as permitting the board to deny the plaintiffs' petitions, we must first address whether these statutory provisions required the board to act on the plaintiffs' petitions under any circumstances. In other words, in deciding whether the trial court properly denied the plaintiffs' requests for writs of mandamus and injunctive relief on the grounds of lack of "proper purpose," we necessarily must first decide whether the trial court could have granted such relief even if there had been such a proper purpose. In deciding this underlying question, we must first determine whether the board had the discretion to deny the plaintiffs' petitions. If we conclude that the board did possess such discretion, then the trial court would not have been authorized to grant the plaintiffs their requested relief even if the plaintiffs' requests had otherwise been for a "proper purpose," because the board would have lawfully exercised its discretion in deciding not to call a referendum vote. We conclude that the board, as the primary legislative body in Windham pursuant to the charter, had the discretion to decide whether to call a town meeting for a rescission referendum on the appropriation of funds to build a town school. We therefore affirm the trial court's decision to reject the plaintiffs' requested relief, but on alternate grounds.

"It is settled law that as a creation of the state, a municipality has no inherent powers of its own. *City*

---

[20] In light of our decision that the board was not required to hold a town meeting upon petition to reconsider the appropriation of money for the construction of a new middle school, we do not reach the issue of whether the architects were required to be protected.

*Council* v. *Hall*, 180 Conn. 243, 248, 429 A.2d 481 (1980); *Pepin* v. *Danbury*, 171 Conn. 74, 83, 368 A.2d 88 (1976); *New Haven Water Co.* v. *New Haven*, 152 Conn. 563, 566, 210 A.2d 449 (1965); *State ex rel. Coe* v. *Flyer*, 48 Conn. 145, 158 (1880). *New Haven Commission on Equal Opportunities* v. *Yale University*, 183 Conn. 495, 499, 439 A.2d 404 (1981). A municipality has only those powers that have been expressly granted to it by the state or that are necessary for it to discharge its duties and to carry out its objects and purposes. *City Council* v. *Hall*, supra, 248. See *Pepin* v. *Danbury*, supra, [74]." (Internal quotation marks omitted.) *Norwich* v. *Housing Authority*, 216 Conn. 112, 123, 579 A.2d 50 (1990). Consequently, in order to determine whether the town charter properly gave the board discretion to deny the plaintiffs' petitions to put a rescission referendum to a town meeting, we must search for statutory authority for this grant of discretion.

The Home Rule Act (act) is the relevant statutory authority. Under the act, municipalities have the power to adopt a charter to serve as the organic law of that municipality.[21] General Statutes § 7-188 (a); *Caulfield* v. *Noble*, 178 Conn. 81, 86, 420 A.2d 1160 (1979). "It is well established that a [town's] charter is the fountainhead of municipal powers. *State ex rel. Raslavsky* v. *Bonvouloir*, 167 Conn. 357, 362, 355 A.2d 275 (1974). The charter serves as an enabling act, both creating power and prescribing the form in which it must be exercised. *Food, Beverage & Express Drivers Local Union* v. *Shelton*, 147 Conn. 401, 405, 161 A.2d 587 (1960); *Thomson* v. *New Haven*, 100 Conn. 604, 606, 124 A. 247 (1924); *State ex rel. Southey* v. *Lashar*, 71 Conn. 540, 545–46, 42 A. 636 (1899). *Perretta* v. *New Britain*, 185 Conn. 88, 92, 440 A.2d 823 (1981)." (Inter-

---

[21] The act provides a detailed procedure for the adoption of a charter. See General Statutes §§ 7-188 through 7-191.

nal quotation marks omitted.) *West Hartford Taxpayers Assn., Inc.* v. *Streeter*, 190 Conn. 736, 742, 462 A.2d 379 (1983).

The act requires charters to conform to certain standards. General Statutes § 7-193. Of particular relevance in this case are the provisions listing the various forms of legislative bodies that municipalities may adopt. General Statutes § 7-193 (a) (1) provides: "Any charter adopted or amended under the provisions of this chapter shall conform to the following requirements: (1) The municipality shall have a legislative body, which may be: (A) A town meeting; (B) a representative town meeting; (C) a board of selectmen, council, board of directors, board of aldermen or board of burgesses; or (D) a combination of a town meeting or representative town meeting and one of the bodies listed in subparagraph (C). In any combination, the body having the greater number of members shall have the power to adopt the annual budget and shall have such other powers as the charter prescribes, and the body having the lesser number of members shall have the power to adopt, amend and repeal ordinances, subject to any limitations imposed by the general statutes or by the charter. The number of members in any elective legislative body, the terms of office of such members and the method by which they are elected shall be prescribed by the charter."

Windham adopted a charter in 1992, pursuant to the act. It created a combination form of government pursuant to § 7-193 (a) (1) (D), combining the board and town meeting forms of government. Although this charter includes many provisions, only a few are relevant here. Most importantly, the charter vested the legislative power of Windham in the board. The charter gave the board the power to "enact, amend or repeal ordinances and resolutions not inconsistent with the Charter or the Connecticut General Statutes provid-

ing for the preservation of good order, peace, health, safety and welfare of the Town and its inhabitants."[22] Windham Town Charter c. V-3 (a). Regarding particular enumerated matters, however, the charter specifies that the board may act only after town meeting approval. Chapter XI-3 of the charter, entitled "When Action by Town Meeting Required," provides that "[t]own meeting approval shall be required for the following: (a) consideration of the annual budget; (b) approval of any additional appropriation in excess of $20,000 for any purpose; (c) authorizing the issuance of bonds or notes or other borrowing; (d) any sale or purchase of real estate of the Town used or reserved for Town or Service District purposes. The Board of Selectmen may submit any other matter it desires to town meeting for its consideration. The town meeting shall not act upon any appropriation in excess of $20,000 except upon the recommendation of the Board of Finance, nor shall it increase the amount of any appropriation above the amount recommended by the Board of Finance."

[22] Chapter V-3 of the Windham town charter, entitled "General Powers and Duties," provides: "Except as otherwise provided in this Charter, the Board of Selectmen shall have the powers and duties conferred by law on boards of selectmen. Except as otherwise provided in this Charter, the legislative power of the Town shall be vested in the Board of Selectmen. The Board of Selectmen shall have the power to (a) enact, amend or repeal ordinances and resolutions not inconsistent with this Charter or the Connecticut General Statutes providing for the preservation of good order, peace, health, safety and welfare of the Town and its inhabitants; (b) create or abolish by ordinance boards, authorities, commissions, departments or offices except those established by Sections VII-4, VII-5, VII-6, VII-7, VII-8 and VII-9 of this Charter and the elected offices established by Article IV of this Charter; (c) establish by resolution such study, advisory or consulting committees and such employment positions as the Board may determine to be necessary to appropriate for the general welfare of the Town, and (d) establish by resolution the salaries, if any, and the provisions for reimbursable expenses of all appointive officials. The Board of Selectmen may contract for services and the use of facilities of the United States or any federal agency, the State of Connecticut and any political subdivision thereof, or may, by agreement, join with such political subdivision to provide services and facilities."

The plaintiffs argue that, notwithstanding the enumeration of a limited number of situations requiring town meeting approval under chapter XI-3, the charter must also comply with General Statutes §§ 7-1, 7-2, 7-3 and 7-7. In the plaintiffs' view, these statutory provisions always control, regardless of whether Windham's charter requires less town meeting involvement. An examination of the intent of the legislature in enacting the act, however, reveals that, unlike in matters of statewide concern, in which the statute preempts the charter; *Caulfield* v. *Noble*, supra, 178 Conn. 86–87 n.3; in matters primarily concerning local matters, the provisions of the town charter control. Because we conclude that the extent of town meeting involvement is a matter of local concern, we agree with the defendants that the statutory provisions do not preempt the charter to require the board to call a town meeting on the petition of twenty registered voters.

In making this determination, we look to the act itself. " 'When the words of a statute are plain and unambiguous, we need look no further for interpretive guidance because we assume that the words themselves express the intention of the legislature. *Johnson* v. *Manson*, 196 Conn. 309, 316, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787 (1986); *Mazur* v. *Blum*, 184 Conn. 116, 118–19, 441 A.2d 65 (1981). When we are confronted, however, with ambiguity in a statute, we seek to ascertain the actual intent by looking to the words of the statute itself; *State* v. *Kozlowski*, [199 Conn. 667, 673, 509 A.2d 20 (1986)]; *Dukes* v. *Durante*, 192 Conn. 207, 214, 471 A.2d 1368 (1984); the legislative history and circumstances surrounding the enactment of the statute; *State* v. *Kozlowski*, supra, 673; *DeFonce Construction Corporation* v. *State*, 198 Conn. 185, 187, 501 A.2d 745 (1985) [superseded on other grounds by *Ducci Electrical Contractors, Inc.* v. *Dept. of Transportation*, 28 Conn. App.

175, 611 A.2d 891 (1992)]; *State* v. *Parmalee*, 197 Conn. 158, 161, 496 A.2d 186 (1985); *State* v. *Delafose*, [185 Conn. 517, 522, 441 A.2d 158 (1981)]; and the purpose the statute is to serve. *Peck* v. *Jacquemin*, 196 Conn. 53, 64, 491 A.2d 1043 (1985); *Verrastro* v. *Sivertsen*, 188 Conn. 213, 221, 448 A.2d 1344 (1982); *Robinson* v. *Unemployment Security Board of Review*, 181 Conn. 1, 8, 434 A.2d 293 (1980).' *Rhodes* v. *Hartford*, 201 Conn. 89, 93, 513 A.2d 124 (1986)." *Norwich* v. *Housing Authority*, supra, 216 Conn. 117–18.

The language of the act unambiguously states that a town charter may prescribe the form of legislative body, provided that such provisions conform to one of the four enumerated types listed in § 7-193 (a) (1). Furthermore, the act states that in a town such as Windham that has chosen a combination of legislative bodies, "the body having the greater number of members shall have the power to adopt the annual budget and shall have such other powers *as the charter prescribes* . . . ." (Emphasis added.) General Statutes § 7-193 (a) (1). This language suggests that if a municipality chooses to do so, it may limit the involvement of the town meeting to only the adoption of the annual budget. In Windham, the town meeting is the body with the greater number of members.

Pursuant to this section of the act, the Windham charter prescribes those instances requiring a town meeting. A petition to reconsider whether the residents of the town want to appropriate over $20,000 is not one of the enumerated situations. Nonetheless, the plaintiffs argue that this situation falls under chapter XI-3 (b) because it is a continuation of the approval of an appropriation in excess of $20,000. We are not persuaded. The appropriation had already been approved at the March 15 town meeting. The plaintiffs are not claiming that the appropriation was made unlawfully. Instead, they did not like the result of the first vote

and want a second bite at the apple. This provision of the charter cannot reasonably be construed to provide for such an interpretation.

In addition to the language of the act, the purpose of the act supports our conclusion. "The purpose . . . of Connecticut's Home Rule Act is clearly twofold: to relieve the General Assembly of the burdensome task of handling and enacting special legislation of local municipal concern and to enable a municipality to draft and adopt a home rule charter or ordinance which shall constitute the organic law of the city, superseding its existing charter and any inconsistent special acts. General Statutes § 7-188; *Sloane* v. *Waterbury*, 150 Conn. 24, 26–27, 183 A.2d 839 (1962); *State ex rel. Sloane* v. *Reidy*, 152 Conn. 419, 209 A.2d 674 (1965); *Shalvoy* v. *Curran*, 393 F.2d 55, 59 (2d Cir. 1968); see Littlefield, 'Municipal Home Rule—Connecticut's Mature Approach,' 37 Conn. B.J. 390, 402 (1963); 56 Am. Jur. 2d [182-83], Municipal Corporations § 126 [1971]; 62 C.J.S., Municipal Corporations § 124. The rationale of the act, simply stated, is that issues of local concern are most logically answered locally, pursuant to a home rule charter, exclusive of the provisions of the General Statutes. See Lockard, 'Home Rule for Connecticut's Municipalities,' 29 Conn. B.J. 51, 54 (1955). Moreover, home rule legislation was enacted 'to enable municipalities to conduct their own business and control their own affairs to the fullest possible extent in their own way . . . upon the principle that the municipality itself knew better what it wanted and needed than did the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs.' *Fragley* v. *Phelan*, 126 Cal. 383, 387, 58 P. 923 (1899); accord 1 Antieau, Municipal Corporation Law, § 3.03; 1 McQuillin, Municipal Corporations (2d Ed.) § 93." *Caulfield* v. *Noble*, supra, 178 Conn. 85–87.

"In furtherance of this stated goal of home rule legislation, it has been held that a general law, in order to prevail over a conflicting charter provision of a city having a home rule charter, must pertain to those things of general concern to the people of the state, and it cannot deprive cities of the right to legislate on purely local affairs germane to city purposes. *Portland* v. *Welch*, 154 Or. 286, 59 P.2d 228 (1936); see 62 C.J.S., Municipal Corporations § 125; 5 McQuillin, Municipal Corporations (3d Ed. 1969 Rev.) § 15.20 (issues relating strictly to municipal affairs are within the exclusive delegated power of municipalities coming under home rule). In the numerous jurisdictions having either constitutional or legislative municipal home rule, the overwhelming view accords to the municipality the fullest extent of home rule authority, consistent with law, in matters of local concern. See, e.g., Littlefield, [supra, 37 Conn. B.J. 390]; Klemme, 'The Powers of Home Rule Cities in Colorado,' 36 Colorado L. Rev. 321 (1964)." *Caulfield* v. *Noble*, supra, 178 Conn. 87–88. Furthermore, in order to achieve the goal of local autonomy over issues of local concern, we do not "apply a strict construction to the home rule legislation, because to do so would stifle local initiative . . . ." *Norwich* v. *Housing Authority*, supra, 216 Conn. 116.

In *Caulfield* v. *Noble*, supra, 178 Conn. 91, we held that decisions regarding the appropriation of surplus revenues are matters of local concern. In *Shelton* v. *Commissioner of Environmental Protection*, 193 Conn. 506, 521, 479 A.2d 208 (1984), we held that the organization of local government or local budgetary policy is a matter of local concern. Furthermore, the enactment of ordinances by initiative and referendum has been recognized as a matter of local interest. *In re Pfahler*, 150 Cal. 71, 82, 88 P. 270 (1906); 56 Am. Jur. 2d 193, supra, § 138.

In contrast, matters that concern public health and safety, and other areas within the purview of a state's police power, have traditionally been viewed as matters of statewide concern. *Kansas City* v. *J.I. Case Threshing Machine Co.,* 337 Mo. 913, 926, 87 S.W.2d 195 (1935); *Axberg* v. *Lincoln,* 141 Neb. 55, 60, 2 N.W.2d 613 (1942); 56 Am. Jur. 2d 185, supra, § 128. For example, in *Dwyer* v. *Farrell,* 193 Conn. 7, 475 A.2d 257 (1984), we held that a local ordinance placing restrictions on the sale of handguns more substantial than those in the state statutes was preempted by the state statutes. The purpose of the state statutes at issue in *Dwyer* was to protect the public. Id., 12. The statutes "clearly indicate a legislative intent 'to protect the safety of the general public from individuals whose conduct has shown them to be lacking the essential character or temperament necessary to be entrusted with a weapon.' *Rabbitt* v. *Leonard,* 36 Conn. Sup. 108, 115–16, 413 A.2d 489 (1979)." Id., 12–13.

At issue in this case is whether Windham's primary legislative body—the board of selectmen—can be compelled to hold a referendum on the petition of the town's voters despite the fact that the charter explicitly lists the situations in which a town meeting is required. We conclude that this matter is of purely local interest. It is similar to the enactment of an ordinance by referendum or petition, which has been held to be a local issue. *In re Pfahler,* supra, 150 Cal. 82; 56 Am. Jur. 2d 193, supra, § 138. It is also similar to the appropriation of a town's budget, which is also a local matter, in that it relates to concerns that are of particular importance to the town itself. It is of no import to the rest of Connecticut whether the town of Windham holds a second referendum to reconsider an issue on which its voters have already voted. Indeed, unlike the sale of handguns, the regulation of which may clearly impact the " 'safety of the *general public*' "; (emphasis added)

*Dwyer* v. *Farrell*, supra, 193 Conn. 12; the use of the town meeting form of government impacts only the municipality itself and does not affect the interests of the rest of the state.

Alternatively, the plaintiffs argue that, for purposes of appropriating funds in excess of $20,000, the legislative body is the town meeting instead of the board of selectmen. They claim that "[i]f a legislative body has the power to adopt a binding resolution or ordinance, it necessarily must have the concomitant power to rescind such legislative action when it deems such measure appropriate." The plaintiffs argue, therefore, that a town meeting to rescind a prior legislative act is mandatory upon petition.

Although the plaintiffs' first statement is a fair reading of Windham's charter only to the extent that town meeting approval is required for appropriations in excess of $20,000, the second claim completely ignores the charter. In fact, the plaintiffs' only support for this second proposition consists of citations to cases that arose prior to the enactment of the act. See, e.g., *Madison* v. *Kimberly*, 118 Conn. 6, 169 A. 909 (1934); *Staples* v. *Bridgeport*, 75 Conn. 509, 54 A. 194 (1903); *Terrett* v. *Sharon*, 34 Conn. 105 (1867). It does not necessarily follow that "[i]f town meeting approval is necessary to approve construction of a new middle school . . . the only legislative body capable of exercising the well settled power to rescind such action is the town meeting." As we have already stated, the extent of the use of the town meeting form of government is a matter of purely local concern. Windham's town charter enumerates those situations in which town meeting approval is required. A referendum to reconsider the prior appropriation of more than $20,000 is not one of these enumerated situations. Had the town wished to require a town vote upon petition to repeal or reconsider a prior appropriation, such a provision

could have been included in the charter. Similarly, had the town wished to require a town meeting upon petition by a certain number of people, such provision also could have been included in the charter.

The plaintiffs also claim that chapter V-7 of the town charter indicates that the board was required to put the plaintiffs' petition to a referendum vote.[23] That provision provides in relevant part that "[a]ny elector of the Town may file with the Town Clerk a petition which conforms with the requirements of Section 7-9 of the Connecticut General Statutes, Revision of 1958 as amended, except as provided herein, and requests that a proposed *ordinance* be adopted. The petition shall be signed . . . by qualified electors of the Town numbering at least two hundred (200) or ten percent (10%) of the electors voting in the last regular Town election, whichever is less. . . . If the Board of Selectmen fails to adopt the proposed *ordinance,* without any substantial change, within thirty (30) days after receipt of such certification, the Board shall schedule a referendum to be held within forty-five (45) days of the end of the period in which the Board of Selectmen has to adopt such proposed *ordinance.* " (Emphasis added.) General Statutes § 7-148 (b) states that "[p]owers granted to any municipality under the general statutes or by any charter or special act, unless the charter or special act provides to the contrary, shall be exercised by ordinance when the exercise of such powers has the effect of: (1) Establishing rules or regulations of general municipal application, the violation of which may result in the imposition of a fine or other penalty; or (2) [c]reat-

---

[23] The plaintiffs also argue that because there is a constitutional right to petition pursuant to article first, § 14, of the Connecticut constitution, the board was required to hold a referendum upon petition. The plaintiffs have misinterpreted this "right." This right refers to the right of an individual to petition the government. It does not obligate the government to act on such a petition. In this case, the plaintiffs have not been denied their right to petition the board.

ing a permanent local law of general applicability." This language, expressly limited to ordinances, cannot reasonably be construed to apply to the present situation. The plaintiffs have not proposed an ordinance. Their petitions to the board would neither establish rules or regulations nor create a permanent local law. Instead, they were merely petitioning for a rescission referendum.[24]

We conclude that General Statutes § 7-1 does not preempt the provisions in the Windham town charter that delineate the circumstances requiring town meeting involvement. Consequently, the board was not required to act on the plaintiffs' petitions, because they did not fall within one of the enumerated circumstances requiring town meeting involvement. Thus, the trial court properly denied the plaintiffs' request for mandamus and injunctive relief.

The judgment of the trial court is affirmed.

In this opinion the other justices concurred.

---

[24] While the plaintiffs may be correct in that a petition involving an appropriation can be in the form of an ordinance, that is not the case here.