[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal from the re-assessment program of October 1, 1991 by the defendant town of Wallingford. The appellant owns and operates a "state of the art" refrigerated warehouse on a 25.12 acre sight, the area remaining after deducting an area siightly over an acre which is dedicated to road expansion. The site has the capability of expansion and/or additional development, though to what extent the parties disagree.
The town assessed the property based on a fair market value (FMV) of $5,245,142.80. The facility on the parcel was constructed in 1989 at a cost of about $5.1 million dollars. The appellants' appraiser valued the property at $4.3 million, while the Town produced two appraisals, one for $6.5 million and one for $6.1 million, all FMV's.
Testimony and arguments in this case consumed almost three days, in the course of which the appellant assailed every aspect of the town's appraisals.
In addition to contesting each of the three appraisal methods utilized by the Town's two appraisers, the appellant also argued that implicit in the Town's assessment process is a form of double taxation. In Wallingford, the appellant's refrigeration equipment is taxed separately as personal property, and, the appellant urges, the Town's appraisers have also appraised the facility as a refrigerated warehouse.
 I
After consideration of the extensive testimony which the court heard, there is virtually nothing on which these appraisers agree save for the actual cost of construction.
The court has examined the appraisals in the light of this testimony and concludes that neither the sales comparison method CT Page 2930 nor the income capitalization approach, afford the court with figures it can adopt. While it is anticipated that real estate appraisal will contain subjective conclusions, the court is unable to make cut of the conflicting data any consistency or reliability sufficient to render a valid judgment.
Obviously, an explanation of the court's comments are in order. Thus, the court notes first the fact that the subject property is owner built and occupied for a specific purpose. The income capitalization approach is therefore wanting for several reasons. As appellants's counsel noted in final argument, the office space in this building is not apt to attract the usual renter of ordinary office space. The attempt to analyze leases in existence and apply them to this property then required the application of subjective conclusions, little of which has a basis in fact.
Also contributing to the confusing mix in using this method is the application of varying capitalization rates, one for 10.5%, one for 11.5%, and one appraiser not using a capitalization rate. The court is not comfortable with any one of the three.
In the use of the comparable sales method, the conflicting theories really erupted. Two refrigerated warehouse sales came into the picture, neither in the Wallingford area and totally removed from either the New Haven — Wallingford market referred to by some appraisers or the Meriden — Wallingford market discussed by others. One of the properties may not have been a true arm's length transaction.
These two sales also produced conflicting opinions on the demand for refrigerated storage areas and led to little more than conjecture as to the state of this market. References were even made to New York and Massachusetts markets.
The paucity of sales actually comparable to the subject property obligated the appraisers to resort to land sales and a handful of buildings so that again the wholesale use of subjective conclusions was employed.
In Truitt Brothers, Inc. v. Department of Revenue,
302 On. 603, 732 p. 2d 497 (1986), cited by the appellant, the Oregon Supreme Court stated:
"When the market contains an insufficient number of CT Page 2931 transactions to create value patterns, the application of the [market sales] approach may be limited or inappropriate. Large, special purpose properties are often insufficiently similar to other properties that have sold recently to allow an appraiser to impute value from them. For such properties, using one or both of the other appraisal approaches usually proves more reliable." American Institute of Real Estate Appraisers, "The Appraisal of Real Estate," 311 (8th ed. 1983)
Unlike the Truitt case, the subject property and the only likely comparables were not so similar as to be "persuasive of market value" when used as comparables.
These factors, coupled with the fact that the subject property was, at the most, two years old on October 1, 1991, support the conclusion that the cost approach to value should be applied.
This decision also addresses the appellant's claim that the Town has applied double taxation. With the court's approach, there will be no room to speculate that warehouses were used for comparables and their values enhanced to serve as comparables to the subject property — a refrigerated warehouse with the refrigeration equipment taxed separately.
 II A.
The appellant's appraiser and one of the Town's appraisers utilized the actual construction figures and arrived at essentially the same building cost; $5.1 million. The Town's appraiser calculated an actual cost of $5.1 million, but used a slightly lower figure in his "Summary," this figure reflecting Marshall Valuation Service estimates. The third appraisal employed a different approach to this method which the court rejects because the actual costs were available and were so recent. See PRKM. Inc. v. County of Hennespin, 1991 WL 227922
(Minn. Tax, 1991).
The appraisals diverge at this point, with the appellant allocating $1.3 million to site value, while the Town's appraisal sets this value at $1.8 million. Both appraisers compute this value on 26.17 acres, but, as noted above 25.12 acres remain after deducting the area dedicated to highway expansion. CT Page 2932
The court has examined the sales of commercial land in all the appraisals and conclude that the land value should be set at $1,507,200. This figure represents a $60,000 per acre value of 25.12 acres.
Both appraisers assess depreciation at about $112,000, but the appellant's appraiser claims a further reduction is appropriate. He argues that "External or Economic Obsolescence" of 35% or $1,785,000 is dictated by virtue of "market conditions caused by the region's recession."
From the onset of these proceedings, the court has indicated its concerns over this deduction. It is a figure the appraiser has estimated. (See last sentence, page 26, Exhibit A). Though counsel has offered cases to support the principal of external obsolescence, no substantiation for this "estimate" has been forthcoming. In a case cited by the appellant, the court rejected just such an adjustment because it was unsupported by credible evidence. Badische Corporation v. Town of Kearny, 14 N.J. Tax 219
(1994).
The requirement for substantiation is recognized in the leading text on the subject of real estate appraising, "The Appraisal of Real Estate," American Institute of Real Estate Appraisers. At page 358 of the 10th edition, the subject of external obsolescence is discussed:
External Obsolescence
External obsolescence, the diminished utility of a structure due to negative influences emanating from outside the building, is usually incurable on the part of the owner, landlord, or tenant. External obsolescence can be caused by a variety of factors — e.g., neighborhood decline; the property's location in a community, state, or region; or local market conditions. Any estimate of external obsolescence must be based on a thoroughneighborhood analysis and justified in the neighborhood analysis section of the appraisal report. (Emphasis added).
The text goes on to say:
Two methods can be used to measure external obsolescence. The appraiser should select the procedure that is best supported by market evidence. The appraiser can either 1) capitalize the CT Page 2933 income or rent loss attributable to the negative influence, or 2) compare sales of similar properties that are subject to the negative influence with others that are not. pertinent sales data are abundant, the second procedure is preferred. However, an appraiser may encounter significant practical problems in attempting to account for other differences between the subject property and the comparable properties. Care should be exercised when this method is used.
 B.
After careful and repeated consideration of this reduction for obsolescence, the court concludes that it has not been substantiated and the court cannot accept the appraised figure reflecting an obsolescence factor of 35%.
The court feels obligated to comment on some of the appellant's other arguments with respect to the external obsolescence claim.
In its brief, the appellant cites the PRKM case (supra) as supportive of this reduction in arriving at fair market value. A reading of that case however reflects the same concern by that court as is present for this court.
At issue was a 60% deduction for functional and economic obsolescence. The court concluded:
"From his reproduction costs Mr. Patchin deducts over 60 percent for functional and economic obsolescence, principally changes in market conditions and the alleged effect of the Tax Reform Act of 1986. However, the effect on the market of the TaxReform Act of 1986 was not quantified. We find the 61.7 percent deduction for functional and economic obsolescence for a hotel that has been open for less than a year (as of the 1987 assessment date) to be excessive. We prefer Mr. Stimmler's allowance for depreciation and economic obsolescence. We agree with Mr. Stimmler that no functional obsolescence should be allowed." Supra at p. 38 (emphasis added).
The appellant also cites Security Bank Minnesota v. County ofMower, 1996 WL 138106 (Minn. Tax) (1996) as support for his 35% obsolescence factor. In that case, the court accepted a 55% deduction for obsolescence. However, in offering that deduction, the appraiser analyzed sales of other banking facilities. CT Page 2934
Such an analysis was not provided to the court in this case and while it is recognized that there were few refrigerated warehouses for the appraisers to use for the subject property evaluation, the Security Bank case illustrates that a basis for one's "estimate" is essential.
The court notes that throughout these proceedings, this property has been referred to as a two year old facility on the assessment date of October 1, 1991. Other evidence submitted by the appellant indicates that in August of 1989, a foundation existed on the parcel. (Exhibit B). It stands to reason that on October 1, 1991, the facility was less than two years old, adding further doubt to the 35% obsolescence estimate.
 CONCLUSION
While the appellant has raised serious questions about the Town's appraisals, the burden of proof is on a party claiming to be aggrieved to prove the assessor's value is not the true and actual value. MacLean v. Darien, 43 Conn. App. 169, 174 (1996), (citations and internal quotations omitted).
In the court's view, this has not been demonstrated by a fair preponderance of the evidence. It necessarily follows that the appellant has not proved its proffered value is the true and actual value.
The appeal is therefore denied and the Town's determination of fair market value at $5,245,140 may stand.
Anthony V. DeMayo, JTR