[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action is a real estate tax appeal. The subject of the appeal is a two-story, 115 room limited service hotel located at 260 Main Street in East Windsor.
The subject property has been owned by the named plaintiff, Shaner Hotel Group Properties One Limited Partnership, or other related entities, since 1994. All of these related entities have been added as plaintiffs to this action and will be collectively referred to as the `plaintiff' in this decision. (See Amended and Restated Application filed 1/5/00; Stipulation of Parties filed 1/5/00.)
The last town-wide revaluation in East Windsor took place on the October 1, 1995 grand list. On October 1, 1995, the East Windsor assessor valued the subject premises at a fair market value of $5,662,386. The plaintiff's appraiser, Hospitality Valuation Services (HVS), valued the subject premises, as of October 1, 1995, at $4,100,000. The town's appraiser, Lesher-Glendinning Municipal Services, Inc. (L-G), valued the subject premises, as of October 1, 1995, at $5,800,000. Both appraisers agree and we concur that the highest and best use of the subject premises is for a limited service hotel.
The subject premises is known as Holiday Inn Express and is located on CT Page 6337 6.62 acres of land at 260 Main Street, East Windsor. Bradley International Airport is located five miles west of the subject property. The property is a two story hotel located below grade of Interstate 91, and is not visible from Interstate 91. The hotel was constructed between 1989 and 1990. As of October 1, 1995, the hotel was in average condition. A limited service hotel is a hotel without frills. There is no full service bar or restaurant or swimming pool on the premises. The property contains three meeting rooms, breakfast area, exercise room, and approximately 260 surface parking spaces. As part of the amenities of the hotel, it provides guests with free shuttle service to and from Bradley International Airport.
The plaintiff's' appraiser, HVS, considered all three approaches to value, cost, market sales and capitalization of income. However, HVS found the cost approach to be meaningless, and the market sales to be unreliable since there were no limited service hotels to use as good comparables. HVS relied primarily on the capitalization of income approach by using the direct capitalization approach. There are two methods used to determine value by capitalizing income. The first method is the direct capitalization approach. "Direct capitalization is a method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step — either by dividing the income estimate by an appropriate income rate or by multiplying the income estimate by an appropriate factor." The Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992), p. 419. The second method is known as the discounted cash flow method. This approach "is a method used to convert future benefits into present value by discounting each future benefit at an appropriate yield rate or by developing an overall rate that explicitly reflects the investment's income pattern, value change, and yield rate." Id., p. 420.
In the present case, HVS used only the direct capitalization approach, whereas L-G used both the direct capitalization approach and the discounted cash flow method approach. In using the direct capitalization approach, both appraisers deducted the return on the personal property of the subject hotel from the total income to arrive at the income attributable to the real estate. HVS found the return on the personal property of the hotel to be $17,000. L-G found the return on the personal property of the hotel to be $18,921. HVS used a capitalization rate of 11.46% and multiplied the value of the personal property, as reported to the assessor by the taxpayer to arrive at a rounded return of $17,000. L-G, on the other hand, took the economic life of the personal property as found in the Marshall Valuation Service cost manual and hotel industry sources to be 8 years and divided $151,370 by 8 to arrive at $18,921. We will deduct L-G's value of $18,921 for the return on property from the net operating income to be determined later in this CT Page 6338 decision.
In developing the net operating income for the subject property in order to arrive at a final value, HVS used the historical data of the subject hotel. However, as HVS noted, the subject property was operated as a Comfort Inn affiliate until May, 1995. During the period prior to May, 1995, the subject property made minimal net income. Revenue levels were weak due to weak occupancy and average rate results. Expenses were unusually high. With the purchase of the subject hotel in May, 1995 to be operated and used as part of the Holiday Inn Express chain. its competitive position in the hotel market substantially improved. This meant that both the room rate and occupancy level would improve, and it was expected that the plaintiff would operate the hotel more efficiently as a Holiday Inn Express. (See Plaintiff's Exhibit A, p. 49; Defendant's Exhibit 1, p. 19.) L-G, the town's appraiser, points out in its appraisal report that the subject property operated under a cloud of foreclosure prior to being acquired by the present owner and that the hotel operated "significantly below competing lodging facilities in terms of occupancy level and average room rate." (Defendant's Exhibit 1, p. 19.) What has happened in the past is history. What we are required to do is determine the fair market value of the subject premises as of October 1, 1995, not at a prior date.
We have reviewed the analysis of HVS in arriving at its determination of fair market value using the "direct capitalization method. We have also reviewed the analysis of L-G in arriving at its determination of fair market value using both the direct capitalization method as well as the discounted cash flow method. Under the facts in this case, we consider the direct capitalization method to be the most credible approach to value. We note that L-G used 70% as an occupancy percentage in developing its gross income for the subject. While HVS used an occupancy rate of 65%, HVS found that the Holiday Inn, listed as a direct competitor, had an occupancy rate of 70% and that Smith Travel Research (STR), a research service which supplies historical and demand data for the hotel industry, found that the aggregate U.S. average occupancy rate for limited-service hotels was 73.2% in 1994, with a projected 1995 year-end rate of 71.7%. Multiplying a 70% occupancy rate by the 115 rooms results in 80.5 rooms available. We then multiply the 80.5 rooms by the stabilized average room rate of $60 developed by HVS to arrive at $4830 revenue per day. $4830 per day times 365 days equals an annual revenue of $1,762,950. To this amount we add income of $86,000 attributable to telephone and other related income, to arrive at a gross income of $1,848,950. From this amount, we deduct the stabilized gross expenses of $1,155,000 developed by HVS, consisting of departmental expenses of $465,000, operating expenses of $591,000 and fixed expenses of $99,000. (See Plaintiff's Exhibit A, p. 51.) Deducting the gross CT Page 6339 expenses from the gross income leaves us with a net operating income of $693,950. From the net operating income of $693,950, we deduct the sum of $18,921, which was the personal property return developed by L-G (see Defendant's Exhibit 1, p. 21; Plaintiff's Exhibit A, p. 55) to arrive at a final net operating income of $675,029. In order to find the fair market value of the subject property we need to find the capitalization rate to apply to the net operating income. HVS arrived at a capitalization rate of 13.56% by using an overall capitalization rate of 11.46% to which it added an effective property tax rate of 2.10%. L-G, on the other hand, found a tax loaded capitalization rate of 12.06%. This capitalization rate consisted of an overall rate of 10.30% and an effective tax rate of 1.76%. This rate, as L-G points out. "falls very near the average hotel capitalization rate of 10.40% in the 4th quarter of 1995 reported in a nationwide survey entitled "Real Estate Investment Criteria by Property Type', published by the Real Estate Research Corporation." (Defendant's Exhibit 1, p. 33.) When we divide the net operating income of $675,029 by the capitalization rate of 12.06%, we arrive at a fair market value of the subject property, as of October 1, 1995, of $5,597,255.
The valuation of real estate is not an exact science. MacLean v. Townof Darien, 43 Conn. App. 169, 173, 682 A.2d 1064, cert denied,239 Conn. 943, 686 A.2d 122 (1996). The value we arrived at is within approximately one percent of the $5,662,386 value placed upon the property by the assessor on the 1995 grand list. We therefore find that the plaintiff has not met its burden establishing that the property was overvalued by the assessor.
Accordingly, since we find that the East Windsor assessor did not overvalue the subject premises as of the revaluation date of October 1, 1995, judgment may enter in favor of the defendant, dismissing the plaintiff's appeal, without costs to either party.
Arnold W. Aronson Judge Trial Referee